**WISCONSIN POWER AND LIGHT COMPANY, Wisconsin Public Service Corporation, Madison Gas & Electric Company and the Home Insurance Company of New York, Plaintiffs,**

v.

**WESTINGHOUSE ELECTRIC CORPORATION, Defendant.**

No. 85–C–922–S.

United States District Court,
W.D. Wisconsin.

Sept. 16, 1986.

---

Brynelson, Herrick, Gehl & Bucaida, Bradley D. Armstrong and Michael S. Anderson, Madison, Wis., for plaintiffs.

Whyte & Hirschboeck, Peter L. Gardon, Madison, Wis., for defendant.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

Before the Court in this diversity action is the motion of the defendant for summary judgment. The complaint alleges four common law tort claims against the defendant arising out of the failure of a large power transformer which was manufactured and sold by defendant to plaintiffs as joint venturers. Originally filed in the Circuit Court for Columbia County, Wisconsin, on September 6, 1985, defendant removed to this Court by petition filed on September 26, 1985, pursuant to 28 U.S.C. § 1441. Plaintiffs Wisconsin Power and Light Company (WPL), Wisconsin Public Service Corporation (WPSC), and Madison Gas and Electric Company (MG & E), are Wisconsin corporations with their principal places of business in Madison, Green Bay and Madison, Wisconsin, respectively. Plaintiff Home Insurance Company of New York is, according to the removal petition, a New Hampshire corporation with its principal place of business in New York City, and insures the other three plaintiffs with respect to property damage at the Columbia Generating Station operated by them as a joint venture in Columbia County, Wisconsin. Defendant Westinghouse Electric Corporation is a Pennsylvania corporation with its principal place of business in Pittsburg, Pennsylvania. As there is complete diversity and the amount in controversy exceeds $10,000, jurisdiction of this Court is properly invoked under 28 U.S.C. § 1332.

## FACTS

WPL, WPSC and MG & E are engaged in the business of, among other things, generating and selling electric power to consumers in Wisconsin. Although the three companies operate the Columbia Generating Station as a joint venture, the purchase of the transformer which is the subject of this litigation was handled by WPL. The defendant Westinghouse Electric Corporation (Westinghouse) is in the business of manufacturing and selling, among other things, large electrical transformers used in generation and distribution of electrical power.

By letter dated November 6, 1983, WPL invited Westinghouse to submit a proposal to furnish and deliver one main power transformer complete with accessories. Accompanying the letter was a document entitled "Specification W-2806" prepared by the consulting engineers on the plant, Sargent & Lundy, Engineers, of Chicago. Sargent & Lundy reviewed the proposals received in response to the bid invitations, and made recommendations to WPL. The Westinghouse proposal, designated

NMDU-4177, was submitted on December 7, 1973, after WPL distributed an addendum to W-2806. After some additional correspondence and meetings (which will be enumerated below) WPL delivered to Westinghouse a purchase order, numbered 892546, which stated:

Furnish and deliver one (1) 530 MVA, 55°C rise 345 KV/22KV Main Power Transformer in accordance with Sargent & Lundy Specification W-2806 and Westinghouse proposal NMDU-4177 dated 12/7/73 as amended by Westinghouse letters dated 12/31/73 and 1/15/74. Pricing to be as follows:

Quoted price of $688,230, f.o.b. cars, Columbia less $1,998.00 for payment net 30 days, less $1,600.00 for deleting spare low voltage bushing. Price is escalable per Westinghouse letters of 12/31/73 and 1/15/74. Price includes oil at $.30/gal., adjustable on the basis of actual cost of oil at time of shipment; and special Westinghouse out and in warranty.

Total base price is $684,632.00 escalable. The order was dated January 23, 1974.

The transformer was delivered to the Columbia Generating Plant on February 17, 1975. It was completely assembled and tested and then stored in the open as a spare generator until January or February 1978, when it was installed on a permanent foundation, fully energized and placed in service. Except for the failure of a bushing caused by a malfunctioning sprinkler system in late 1978, the transformer operated satisfactorily until September 9, 1982. For purposes of this motion, it is assumed that the transformer shut down on that date due to the malfunction of a bushing, the bushing failure being the immediate cause of significant damages to the transformer. (The Court will elaborate upon this "fact" in the opinion which follows.) According to the complaint, repairs to the transformer were at least $1,351,000.

The pertinent provisions of the documents applicable to the purchase of the transformer are as follows:

The cover letter to the bid invitation, signed by Douglas Peterson, WPL's Technical Buyer, stated that:

You are invited to submit a proposal to furnish and deliver one main power transformer, with an unloading and erection option in accordance with the enclosed specification. Enclosed for your use in preparing a proposal are specifications, proposal forms, and applicable drawings.

The particular piece of equipment being bid was described in section 105 of the document entitled "Specification for Main Power Transformer," the section being entitled "Scope of Work: "

Furnish and deliver f.o.b. cars at the above station, the following equipment, arranged as shown on the drawings listed in Section:

ONE (1) 530 MVA at 55°C Rise FOA MAIN POWER TRANSFORMER.

Transformers shall be complete with accessories as specified hereinafter and shall include one (1) spare bushing for the low voltage terminals.

The proposal data requested of bidders included five subdivisions: Delivery, Points of Shipment, Drawings, Transformer Data, and Physical Data. Under Transformer Data, at subsection 4.15, the bidder was to submit data concerning bushings. The specifications for bushings were contained in section 110.17 (entitled "Terminal Connections") of Sargent & Lundy's Specification for Main Power Transformer, Job 4789. It specified that "Transformer leads shall be brought out of the transformer case by means of bushings of the outdoor type." Further, it specified that:

Bushings for the H-Winding shall be mounted on the top of the transformer case for connection to exposed overhead conductors.

Finally, subsection "g" specified that high voltage bushings shall be Westinghouse Electric Corp. as shown on drawing 770C940—Line 1.

Also accompanying the bid invitation was a document entitled "Standard Specifications for Outdoor Oil-Immersed Power

Transformers." At section 7, further requirements for bushings were set forth, including the requirement bushings of higher than 15kV be liquid filled, and that:

7. BUSHINGS

7.1 All bushings shall have electrical and mechanical characteristics suitable for the service voltages specified and shall comply with the latest ANSI Standard for impulse and 60 Hz withstand values.

This specification also provided that "all bushings shall be subject to the review of drawings showing their details of construction." In the same document, there was a section of specifications for "Accessories and Fittings" (section 11) which contained no reference to bushings.

Westinghouse's proposal offered to furnish:

1—530000 KVA, Class FOA, 55°C Rise, Three Phase, 60 Hertz, Two Winding, Shell-Form Generator Transformer.

\* \* \* \* \* \*

Special accessories included in the proposal:

3—H.V. Bushings 1050 KV BIL 205" Creep

\* \* \* \* \* \*

In addition, the following standard accessories and features will be supplied: [no further reference to bushings.]

The proposal also specified, at a document entitled "Power Transformer Performance Specification," the BIL rating (1050 KV, 205 inch creep) and type ("O") of the high voltage bushing. The same information was supplied in Westinghouse's completion of section 4.15 of the bid form, "Proposal Data for Main Power Transformer" accompanying the bid solicitation. Attached to this document was a lengthy construction description entitled "Westinghouse Formfit Shell Form Construction," which noted at the end that:

This unit will be shipped as complete as possible consistent with shipping limitations and protection to the equipment. The parts shipped detached for field mounting will be:

All bushings ...

One final reference to bushings is contained in still another attachment to the Westinghouse proposal. In an illustrated pamphlet describing the features of the Westinghouse transformer, including oil type, pumps, shell, current transformers, gauges and cooling equipment, there appears a page picturing three types of condenser bushings, including a type "o" oil impregnated bushing for use at 115 kv and above. They are described as meeting "ASA requirements in the ratings where standards have been adopted and in these ratings are interchangeable with circuit breaker bushings of the same voltage class and current rating."

The warranty provision of the bid solicitation was contained at paragraph 5, exhibit A of the specifications prepared by Sargent & Lundy. The document title is as follows:

GENERAL CONDITIONS

For Equipment and Material Purchases Wisconsin Power and Light Company (Form 207 WP & L; 10–28–71)

\* \* \* \* \* \*

A copy of this document with paragraph 5 marked is attached as Appendix A. The bid solicitation, at section 4.4, instructed bidders that exceptions to the bid documents had to be noted:

Any contract or purchase order resulting from these Bid Documents will incorporate the terms and provisions of said documents. It will be assumed that Bidder agrees to the provisions of said documents, unless exceptions are specifically and clearly listed in this bid. All such exceptions must be listed together and specifically identified as *Exceptions.* Bidder's printed terms and conditions are *not* considered specific exceptions.

The cover letter to the Westinghouse proposal contained a paragraph concerning exceptions to several provisions in Form 207 in pertinent part, the paragraph reads:

Exception is taken to the following paragraphs in General Conditions Form 207:

Paragraph 5—Material and Warranty (see above comments)

\* \* \* \* \* \*

Paragraph 15—Indemnity. Westinghouse will indemnify and save purchaser harmless for, but only for, claims for physical damage to property and personal injuries, including death occurring during the performance of this contract and resulting directly and solely from the negligence of the employees of Westinghouse while engaged in such work.

This contract will be considered complete when the transformer is installed and made ready for service in accordance with the Sargent & Lundy Specification, and Westinghouse Proposal, and has been accepted and paid for by the Wisconsin Power & Light Co.

The "above comments" referenced in the exception to paragraph 5 concerned an explanation of the proposal's warranty provisions. The letter stated that the price in the bid was based on Westinghouse's form Warranty and Special Warranty (see Appendix B to this decision). A deduction from the bid would be allowed should WPL decide to decline the Special Warranty. The letter explained that the Special Warranty covered a fairly complete list of actions which Westinghouse would take during the first 18 months after shipment. It also noted that all such enumerated actions, except items 1 and 7, would be taken for ten years after shipment. Finally, the letter stated:

> Note that the special warranty applies to the entire transformer during the first 18 months from shipment and that it applies only to the main core and coil assembly and tank of the transformer during the period from 18 months after shipment to 10 years after shipment.

The letter later noted that the ten-year core and coil assembly warranty "is a substantially better warranty than required by your specification."

The Westinghouse proposal contained a warranty provision in an attachment denominated "Selling Policy 48–600 Large Power Transformer Equipment." A copy of this document, including the Standard Warranty, the Special Warranty and the Limitation of Liability sections is attached as Appendix B.

After the Westinghouse proposal was submitted to WPL, a letter from Robert L. Johnson, Special Representative of Westinghouse, dated December 31, 1973, was addressed to Douglas Peterson, WPL's Technical Buyer. Referencing a meeting of December 27, 1973, Johnson noted the exception taken to paragraph 5 of Form 207 by Westinghouse. He stated that:

> After our meeting on December 27 there seemed to be a very good understanding of our standard 10–year warranty governing this transformer. We sincerely feel it more than meets the warranty requirement of your specification. We do not have an alternate shorter warranty to offer at this time, but perhaps the following will help to put our core and coil 10–year warranty in proper perspective.

The letter went on to evaluate the financial benefits of the 10–year warranty, suggesting that each additional year of warranty was worth about one percent of the purchase price for that part of the transformer warranted.

Still further explanation of the Westinghouse proposal as it concerned the warranty is contained in another letter from Johnson to Peterson, dated January 15, 1974. Again referencing a prior conversation, this time on January 11, 1974, the letter stated as follows as it concerned the warranty:

STANDARD WARRANTY

Under our standard warranty, described in Selling Policy 48–600 dated June 14, 1973, we do not pay transportation either way should the transformer need to be returned to our factory for a warranty repair. This statement is applicable during the first 18 months of warranty coverage as well as the balance of 8½ years of warranty coverage on the core and coil assembly. During the first 18 months only of the standard warranty

coverage we will be responsible for handling all.

SPECIAL OUT–IN WARRANTY

Under this special warranty transportation both ways will be covered by Westinghouse should a warranty repair be required. A special listing of those items Westinghouse will be responsible for under the special warranty is shown on page 2 of our quotation letter dated December 7, 1973. You will note that the listing of 8 items are related to any difficulty that occurs during the first 18 months after shipment and that the paragraph on the top of page 3 of the December 7 letter states that if a difficulty occurs after 18 months from the date of shipment, but within 10 years from the date of shipment, and Wisconsin Power & Light Company has purchased the special out and in warranty, Westinghouse will be responsible for the expense of all items listed above except items 1 and 7. However, under the special out-in warranty no 611 handling is included after 18 months from the date of shipment. In answer to your question as to what is included for the special out-in warranty coverage for which we have quoted at $13,324, or 2% of the transformer bid price, it could be said in summary that should a warranty repair be required we would provide transportation both ways, disassembly and reassembly along with repair of the transformer during the first 18 months and we would provide handling, transportation and repair of the core and coil assembly during the last 8½ years of the 10–year warranty. You should also note that our quotation has estimated the transportation cost, one way, of the transformer to be 2% of the transformer price, or approximately $13,365.

Your indemnity clause, and our limitation of liability statement, are both related to the applicable warranty for the apparatus furnished or for the service performed under the contract. For the Engineering Service portion of our quotation a 1 year warranty applies and our limitation of liability would apply for the same period of time. Likewise, for the transformer apparatus to be furnished our limitation of liability would extend for 10 years, the same period of time covered by our warranty.

We wish to confirm that your specification and our proposal bill of material both include a spare low voltage bushing. This spare bushing can be omitted at a net deduction of $1,600.

Both of the above letters from Johnson to Peterson were referenced in the purchase order. On the back of the purchase order were "term and conditions" which included the following:

The Seller warrants that all articles covered by this order will be in strict accordance with the specifications and drawings or other descriptions furnished by the Buyer and free from defects in materials and workmanship. If any failure to comply with this warranty appears in equipment (as distinguished from material) specified in this order within one year from date of shipment, the Buyer will notify the Seller thereof immediately and the Seller shall thereupon remedy such failure by adjustment or by repair or by replacement (f.o.b. Seller's original point of delivery) without expense to the Buyer. In the event Seller's usual published warranty applicable to the materials or services covered by this order is more favorable to Buyer in any respect, Seller's warranty shall apply in such respect.

Further facts will be discussed within the body of the following opinion.

## MEMORANDUM

Despite the predominance of facts pertinent to the contract between the parties, plaintiffs' complaint contains no contract claims, but instead consists of four tort claims. They are products liability, negligence, negligent misrepresentation and strict responsibility misrepresentation. In the first two of these plaintiffs contend that the transformer was damaged because it was in a defective condition and therefore unreasonably dangerous, and that the transformer was negligently designed and manufactured. Each of the misrepresenta-

tion claims is based on the allegation that Westinghouse had represented that the transformer was free from defects in material and workmanship, such representation being either a negligent or intentional misrepresentation.

Defendant advances three arguments in support of its motion for summary judgment on all of these claims. The first is that tort claims are not available for economic losses arising from a commercial transaction. Rather, such losses are recoverable only by way of contract and the Uniform Commercial Code. The second argument is that the contract limited recourse to the warranty provisions. Third, defendant argues that each of the claims lacks merit. According to the argument the doctrine of strict product liability is unavailable under the circumstances presented here. The negligence claim fails because no duty of care was owed to the plaintiffs by Westinghouse independent of those contractually agreed to. The misrepresentation claims are nothing more than warranty claims.

## I. *Economic Loss*

■ Defendant's argument for summary judgment on this, the most contentious of the grounds advanced by the defendant, is fairly simply stated. It is argued that plaintiffs' complaint seeks recovery for purely economic losses consisting of damages to the allegedly defectively manufactured machine itself, which are not recoverable in tort, but only in contract. Plaintiffs counter that the legal premise is insupportable, but at any rate there are factual disputes with respect to the characterization of the loss which preclude summary judgment.

Although Wisconsin law (which both sides concede is applicable, and which is provided for under the terms of paragraph 17, General Conditions, Form 207) does not provide a clear, concise statement that economic losses are not recoverable in tort, the authorities which are available point clearly in that direction. The Court of Appeals has recently provided an extensive discussion of this subject, citing all of the pertinent Wisconsin cases and concluding that:

In short, it is not at all clear to us whether the Wisconsin courts would sustain a tort action in the circumstances of this case. Because we are unable to predict what the Wisconsin courts would do in such a case, and because of the substantive policy considerations involved, we hesitate to expand Wisconsin law to allow these tort claims in the absence of a more direct indication of intent by the state courts or legislature.

*Twin Disc, Inc. v. Big Bud Tractor,* 772 F.2d 1329, 1323 (7th Cir.1985). The question in *Twin Disc,* as here, was whether negligence and strict liability claims were available for purely economic losses—losses to the defective product itself as opposed to other property—or whether the remedy for such losses is limited to the contract and the Uniform Commercial Code. The Court of Appeals succinctly stated the rationale for the latter point of view:

It would undermine the law of sales and ignore the understanding of the parties as reflected by their contract, it is argued, if the buyer was able to recover for its economic losses under a tort theory after the seller had bargained for and the buyer had agreed to a limitation of warranty remedies.

*Id.* at 1332, citing, among other cases, *Superwood Corp. v. Siempelkamp Corp.,* 311 N.W.2d 159, 162 (Minn.1981) (to recognize a tort action for economic losses arising out of commercial transactions would create a theory of redress not envisioned by the legislature when it enacted the UCC). Dicta in *City of La Crosse v. Schubert, Schroeder & Associates,* 240 N.W.2d 124 (Wis.1976) to the contrary is clearly outweighed by the later holding in *Landwehr v. Citizens Trust Co.,* 110 Wis.2d 716, 329 N.W.2d 411, 414 (1983) that a tort remedy is available only for the violation of a "duty existing independently of the performance of the contract." This Court agrees with Judge Evans' decision in *Ecodyne Corp. v. A.F. Schulz Creamery, Inc.,* Case No. 81–C–1618, Decision and Order (E.D.Wis. August 7, 1984) [Available on WESTLAW, DCTU database] that *Landwehr* dictates

dismissal of negligence and strict liability claims for purely economic losses. The court in *Twin Disc* reached the identical conclusion, and plaintiffs' tortured argument that it did not must be rejected.

Since Wisconsin has not acted, through its courts or legislature, to clarify the question since *Twin Disc*, this Court is compelled to follow the lead of the Court of Appeals and conclude that recovery of purely economic losses is not available in tort.

This leaves the question of whether the loss claimed by plaintiffs is merely economic loss, or loss to other property. Plaintiffs attempt to frame this question as a factual one.

The Court does not agree that plaintiffs present a factual dispute. The characterization of the damages to the transformer as economic loss or something else depends on the legal definition of "economic loss." "Economic loss," despite no clearly articulated definition in Wisconsin law, includes damage to the defective product itself. *Twin Disc, supra,* 772 F.2d at 1333 (citing *Superwood, supra*). Plaintiffs do not seriously dispute this. They assert, however, that the high voltage bushing was not an integral part of the transformer because bushings can be purchased separately from manufacturers other than Westinghouse and are interchangeable. It would follow, therefore, that the damage to the transformer would be damage to other property.

This is simply unconvincing. The bushing performs an integral function of the transformer apparatus. That function is not in dispute: the transformer transforms current from the generator from (in this "set-up" transformer) low to high potential, and the bushing is the conduit through which the current flows. The bushing, according to the drawings and diagrams in the record, extends both into and out of the top of the transformer. A transformer simply does not function without bushings. For purposes of this motion it is assumed that the bushing failed when porcelain in the bushing shattered and allowed arcing which, in turn, produced carbon that contaminated the transformer oil. All of this suggests the intimate relationship between the bushing and the core of the transformer. Even more suggestive is the fact that bushing failure is not mentioned in the complaint itself. The plaintiffs' claims were grounded on a "transformer" failure.

The remainder of the evidence in this case, consisting of the bid solicitation documents, Westinghouse's response and the purchase order itself, is more than suggestive. These dealings between sophisticated parties allow for only one inference: that the transformer, including bushings, was an integrated unit. Westinghouse was invited to submit a proposal for "one main power transformer." The specifications for the transformer stated that "Transformers shall be complete with accessories as specified hereinafter...." Other specifications in the Sargent & Lundy documents detailed the methods by which current would flow from the transformer through bushings, and that bushings would be mounted on the top of the "transformer case" (as opposed to the transformer itself). Finally, the bid specifications included a list of "Accessories and Fittings" which, significantly, did not list bushings at all.

It is true that the Westinghouse proposal did include, as one of several "special accessories" the bushings at issue here. However, the proposal also noted that the unit would be shipped "as complete as possible" with some parts, including bushings, detached to protect the equipment. The conclusion is inescapable that plaintiffs purchased the transformer as an integrated package which included the bushing which allegedly damaged it. Although not controlling because the Court was exercising admiralty jurisdiction (Wisconsin courts could presumably go the other way), the Supreme Court decision in *East River Steamship Corp. v. Transamerica Delaval, Inc.,* — U.S. ——, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) is convincing. In that case, a turbine ring had disintegrated, causing damage to the turbine. The Court concluded that, "Since each turbine was supplied by Delaval as an integrated package, each is properly regarded as a unit." — U.S. at ——, 106 S.Ct. at 2300. The

Court also quoted the Alaska Supreme Court in *Northern Power & Engineering Corp. v. Caterpillar Tractor*, 623 P.2d 324, 330 (Alaska 1981) as follows:

Since all but the very simplest of machines have component parts, [a contrary] holding would require a finding of "property damage" in virtually every case where a product damaged itself. Such a holding would eliminate the distinction between warranty and strict liability.

*Id.* A reading of the case quoted by the Supreme Court shows where plaintiffs' analogy to the tires of an automobile falls apart. It is plaintiffs' contention that the bushing is like an automobile tire. It is often, if not always, made by someone other than the manufacturer of the car, is interchangeable with others from other manufacturers, and, if it fails while the car is moving, can damage the car itself. This is allegedly like the bushing which is interchangeable and which, when it failed, damaged the generator of which it is a part. In *Northern Power*, the Court cited one of its earlier cases where it allowed recovery in negligence for damage to an automobile caused by negligently manufactured brakes, certainly an indistinguishable case from plaintiffs' tire analogy. It did so because the damage was caused by "some violence or collision with external objects not a mere marked deterioration, or even a complete ruin brought about by internal defect." 623 P.2d at 328 (n. 4). This distinction was made because tort law was concerned with potentially dangerous products, not economic expectations. Plaintiffs' claim here, the claim in *Northern Power* (the failure of an oil pressure mechanism which allowed the operation of a diesel powered generator to operate without sufficient lubricating oil) and the claim in *East River Steamship* all share the common thread that the damage was confined to the package purchased by the plaintiffs in each case, the transformer, the generator and turbine, respectively. The damages occurred under circumstances which did not threaten life or other property. Accordingly, the plaintiffs in each case were (or are) attempting to recover for the fail-ure of their economic expectations to materialize. That is a contract claim, not a tort claim.

Accordingly, summary judgment to defendant is appropriate on plaintiffs' negligence and strict liability claims.

## II. *Misrepresentation claims*

■ The foregoing analysis, of course, does not preclude claims that Westinghouse made misrepresentations. Westinghouse, however, disputes that any misrepresentations were made. The Court concludes that as a matter of law plaintiffs' allegations of misrepresentation in the complaint (which are not expanded upon in the factual materials submitted for summary judgment) simply fail to state a misrepresentation claim.

The substantive factual predicate for each of the misrepresentation claims is contained at paragraph 17 of the complaint:

17. That at and before the time of the sale of said transformer to Wisconsin Power and Light Company the defendant represented that said transformer was free from defects in material and workmanship.

This "representation" was allegedly untrue. As defendant points out, however, this "representation" was contained in the warranty accompanying defendant's proposal.

It is well settled that a misrepresentation claim cannot be based on an unfulfilled promise or a future event. *Hartwig v. Bitter*, 29 Wis.2d 653, 139 N.W.2d 644, 646 (1966). A promise that goods are free from defects in material or workmanship under these circumstances is simply not a material representation, but is rather a promise to replace or repair such goods should there prove to be such defects. It is a promise of a future performance of a duty that is limited by the terms of a warranty. If plaintiffs in this case can go forward with such a claim, it is clear that no warranty limitations can be effective. Warranties could no longer be limited in time or as to remedies. None of the authorities cited by the plaintiffs seriously challenges the logic of this conclusion.

Accordingly, Westinghouse's motion for summary judgment on the misrepresentation claims must be granted.

### III. *Limitation of Warranty Provision*

■ Although the previous sections of this decision have disposed of all of plaintiffs' claims, the Court will cursorily address defendant's contention that plaintiffs' negligence and strict liability claims are barred by the terms of the contract.

It is defendant's contention that it warranted the transformer (including the bushings) for 18 months, and the core and coil of the transformer for 10 years, and that such warranty was limited by the Limitation of Liability clause of its proposal which stated that Westinghouse would not be liable in contract or tort for special, indirect, incidental or consequential damages of specified, but nonexclusive, types. Significantly, the warranty time limitations were measured from the date of shipment. The plaintiffs' bid specification for warranties stated that the contractor (Westinghouse) would remedy any defects during the first year of actual service. Oddly enough, the purchase order prepared by WPL contains a form warranty paragraph which measures the warranty period from the date of shipment. Of course, Westinghouse's proposal and its letters explaining the warranty (part of which was actually purchased for an extra fee by plaintiffs) were incorporated into the purchase order.

It might be argued that there is some room to dispute the precise terms of the warranty in some particulars. However, the Court is not faced with a warranty claim. It is incomprehensible how plaintiffs can argue that Westinghouse's Limitation of Liability clause, which was incorporated into the purchase order, and which is not contradicted by anything in the other documents so incorporated, is ineffective. These sophisticated parties dealt at arms length and negotiated the sale of a complex piece of machinery. Plaintiffs cannot seriously contend that the contract failed of its essential purpose because they were denied a fair quantum of remedy when the remedy provided for in the contract was a product of their own making. It is of no consequence that the parties knew that the transformer would not be put into service immediately because plaintiffs' own warranty provision covered the "work" for only one year after that date and the bushing failure took place some four years later. Even if all defendant's warranty provisions were excised from the contract, plaintiffs would still be left without a warranty claim. Such an excision would not give any credence to the tort claims in light of the Court's previous rulings.

### IV. *Conclusion*

Plaintiffs' misrepresentation claims simply fail to state a cause of action because they amount to nothing more than warranty claims which have expired. The negligence and strict liability claims are without merit because such theories of recovery are unavailable in the commercial setting exemplified by the circumstances of this case, or alternatively, because they are barred by the terms of the contract.

Accordingly,

### ORDER

IT IS ORDERED that defendant's motion for summary judgment is GRANTED.

IT IS FURTHER ORDERED that judgment may be entered in favor of the defendant, with costs.

### APPENDIX A

### EXHIBIT A

### SARGENT & LUNDY

### ENGINEERS

### CHICAGO

### GENERAL CONDITIONS

### FOR EQUIPMENT AND MATERIAL PURCHASES

### WISCONSIN POWER AND LIGHT COMPANY

(Form 207 WP & L; 10–28–71)

1. DEFINITIONS: The Contract consists of the Agreement, these General Condi-

tions, the Specification and Drawings (if any), and any other Exhibits specified in the Agreement. The terms "approved", "as approved", "satisfactory", "as directed", "or equal", or other similar terms wherever used in the Contract, shall mean "as approved, etc. by the Consulting Engineers", unless specifically stated otherwise.

Wherever in the Contract the term "Consulting Engineers" is used, it refers to Purchaser's Consulting Engineers, Sargent & Lundy.

The term "WORK" includes, and Contractor shall furnish, unless the context clearly indicates otherwise, all labor, methods, material, equipment, and transportation or other facilities necessary to complete the Contract.

2. INTERPRETATION OF CONTRACT: The Consulting Engineers shall interpret the Contract and any specifications and drawings pertaining to the Contract. In case of conflict between the Consulting Engineers' specifications and drawings, the Consulting Engineers shall determine such conflict and their decision shall be binding on Purchaser and Contractor.

The terms and conditions of these General Conditions and the Consulting Engineers' Specification shall govern the Contract and, unless Purchaser at any time gives written notice to the contrary, shall take precedence over the terms and conditions of any other part of the Contract.

3. CONTRACTOR'S DRAWINGS: Any drawings required to be submitted to the Consulting Engineers shall be submitted by Contractor without unreasonable delay, and no work affected thereby shall be started until Contractor is notified by the Consulting Engineers. No such notification shall relieve Contractor from fulfilling all obligations under the Contract including design and detailing. As far as practicable, each drawing shall bear a cross reference note referring to the sheet number or numbers of the Consulting Engineers' drawings showing the same work.

4. INSPECTION AND TESTING: Purchaser shall have the right at all reasonable times to inspect the WORK and observe production tests and any other tests specified in the Contract. Contractor shall make all necessary arrangements and provide all reasonable facilities and access for such inspection and observation of such tests, either at Contractor's shop or at the mills or shops of any manufacturer where any part of the WORK is being fabricated or manufactured. Contractor shall ascertain the scope of any inspection which may be contemplated, and shall give ample notice as to the time and place when each part of the WORK will be ready for such inspection. Purchaser may reject any part of the WORK found to be defective or not in accordance with the Contract, regardless of the stage of its completion or the time or place of discovery of such errors, and regardless of whether Purchaser's inspector has previously accepted it through oversight or otherwise. Such inspection by Purchaser shall in no way relieve Contractor from his obligations to furnish equipment in accordance with the Contract. In the event Contractor fails to provide Purchaser with reasonable facilities and access for such inspection, and if in the opinion of the Consulting Engineers it is necessary to dismantle the equipment for such inspection, then Contractor shall bear the expense of such dismantling and reassembly.

5. MATERIALS AND WARRANTY: Materials shall be the best of their respective kinds, and shall be new and unused in all cases, unless otherwise specified.

Contractor warrants: (a) that the WORK will conform to the specifications, drawings, samples and other description furnished or specified by Purchaser and/or Consulting Engineers pursuant to this Contract and will be of good material and workmanship and free from defect; (b) that the WORK will be suitable for the purposes intended by Purchaser; and (c) that the WORK will be of the best quality and satisfactory to the Consulting Engineers in every particular. In addition to the foregoing, Contractor agrees, promptly and at his own expense, either to remedy any part of the WORK which during the first year of actual use in service proves

defective or otherwise unsuitable for the aforesaid purposes, or to replace such part of the WORK by shipping to Purchaser a new part under the same terms as apply hereunder to the shipment of the original part. A similar warranty shall apply to any replacement parts. Any part of the WORK shall be considered defective or otherwise unsuitable if it shall not comply with the Contract, or if, among other things, it shall develop an undue amount of noise, vibration, heating, deterioration, strain or wear during the first year of actual use in service, provided that said equipment be kept in good condition and be properly operated during said year. If Contractor does not remedy and/or replace any such work within a reasonable time after written notice by the Consulting Engineers, Purchaser may remedy and/or replace it at Contractor's expense.

Contractor shall be responsible for completely fulfilling all performance specifications contained in the contract and his compliance with any material or design specifications, even though furnished by Purchaser or the Consulting Engineers, shall not alter or diminish such responsibility.

6. PROGRESS REPORTS: Upon request of the Consulting Engineers, Contractor shall submit to the Consulting Engineers on or about the twenty-fifth day of each month, a report stating the progress being made in fulfillment of this Contract up to the fifteenth day of said month.

7. TIME OF DELIVERY: Contractor shall make all deliveries in accordance with the Contract and shall not make any deliveries in advance of the specified delivery dates, without first obtaining Purchaser's written approval. Contractor shall adequately wrap, pack, crate, furnish protection from action of the elements, load, enclose and brace the equipment and/or material to be furnished hereunder, on carrier, in a good and workmanlike manner.

8. CHANGES IN THE WORK: Purchaser shall have the right to make any changes in the WORK, the contract price being increased or decreased accordingly. No claim for changes in the WORK involving additional cost shall be allowed unless each specific change shall have been ordered in writing by Purchaser.

9. BILLING OF ADDITIONAL WORK: All claims for payments for additions to the contract price shall be shown separately on Contractor's invoices, and not included with amounts applicable to the main contract price. Further, any invoices covering additions to the Contract must refer to the specific Change Order or similar written authorization issued by Purchaser, approving such additions, and will not be honored unless such reference is included.

10. LOSS OR DAMAGE: Until delivered to Purchaser at the final destination specified in the Contract, the WORK shall be at Contractor's risk, and if any loss of or damage to the WORK occurs prior to such delivery, regardless of passage of title prior to such delivery, Contractor shall, without cost to Purchaser, promptly make all repairs or replacements necessary to place the WORK in the condition required by the Contract. In the event the Contract calls for equipment or material to be shipped to Contractor by Purchaser or others, and which Contractor is required by the Contract to incorporate in or attach to the equipment being furnished by him, then he shall, upon receipt of said equipment or material, assume the same responsibility for loss or damage thereto as he assumes for the equipment being furnished by him.

11. ROUTING OF SHIPMENTS: Purchaser shall have the option of specifying the routing of shipments. If freight is included in the contract price, and such specified routing increases Contractor's shipping cost, he shall immediately so notify Purchaser, and should Purchaser still specify the more expensive routing, then he shall reimburse Contractor for the increase actually incurred thereby.

12. PAYMENTS: No certificates given or payments made shall be considered as conclusive evidence of the performance of the Contract, either wholly or in part, nor shall any certificate or payment be construed as acceptance of any defective part of the WORK. Contractor shall, if required, at

time of delivery or when final payment is requested, furnish Purchaser or the Consulting Engineers with a verified certificate (or any similar document reasonably requested) showing names of Contractor's suppliers hereunder, the work to be done by and the amount payable to each, and shall furnish waivers or other evidence acceptable to Purchaser that said suppliers have been paid in full or in sufficient amount to justify the requested payment. Acceptance by Contractor of final payment on the contract price shall constitute a waiver of all claims against Purchaser.

13. RELEASE OF MECHANIC'S LIENS: To the full extent permissible by applicable local law, Contractor hereby waives for himself, his successors in interest and assigns, and for all subcontractors, their successors in interest and assigns, any and all claim or right of lien upon Purchaser's property or any part thereof as a result of the furnishing of labor and/or material under the terms of this Contract, or any amendment or supplement thereto, or under any subcontract. Contractor shall execute and deliver such documents, if any, as may be required under any local law to make the foregoing agreement effective and shall give all required notices to subcontractors with respect to the foregoing waiver. If any provision hereof shall be held invalid under local law, such invalidity shall not affect any other provision or provisions hereof which are otherwise valid.

14. ASSIGNMENT OR SUBLEASE: Contractor shall not assign or sublet any part of the WORK without first obtaining Purchaser's written approval. Such approval, if given, shall not relieve Contractor from full responsibility for the fulfillment of all obligations under the Contract.

15. INDEMNITY: Contractor shall defend and indemnify and save Purchaser and the Consulting Engineers harmless from any and all liability or alleged liability and expenses, including attorneys' fees, arising from personal injuries, including death, or damage to property, caused by reason of any act or omission of Contractor, Contractor's subcontractors, agents or employees, whether or not any act or omission of Purchaser and/or Consulting Engineers contributed to said liability, and if so requested, shall procure and maintain adequate insurance covering such risks in companies and under policies acceptable to Purchaser and the Consulting Engineers, said policies to include Purchaser and the Consulting Engineers as additional assureds, if this is available from any responsible insurance carrier, and before the start of WORK shall deliver certificates of such insurance to Purchaser and the Consulting Engineers.

16. PATENTS: Contractor shall pay all royalties and license fees which may be payable on account of the WORK or any part thereof. He shall at his own expense defend any claim brought by others against Purchaser, his successors, assigns or those using the WORK, because the sale or use of the WORK infringes or is alleged to infringe directly or contributorily, rights in, to, or under patents or inventions and will save Purchaser harmless from any liability of any nature or kind (including all costs or expenses), other than any consequential damages, arising out of any such infringement or alleged infringement. In the alternative, and at Purchaser's option, Contractor shall reimburse Purchaser for all costs and expenses including reasonable attorneys' fees incurred by Purchaser in defending any such suits or proceedings. In addition to the foregoing, Contractor shall save Purchaser harmless against, and shall pay all awards of damages assessed and all costs of suit adjudged against Purchaser in such suits or proceedings, provided Purchaser gives Contractor reasonable notice in writing of the institution of any such suit or proceeding, permits him to defend it, and gives him all such information, assistance, and authority as shall be necessary to enable him so to do. In case any part of the WORK is held in any such suit to constitute infringement and its use is enjoined, Contractor shall within a reasonable time either (1) secure for Purchaser the perpetual right to continue the use of such part of the WORK by procuring for Purchaser a royalty-free license or such

other permission as will enable Contractor to secure the suspension of any injunction, or (2) replace at Contractor's own expense such part of the WORK with an adequate non-infringing part or modify it so that it becomes non-infringing.

17. STATE LAW GOVERNING CONTRACT: The construction of this Contract shall be governed by the law of the state where the land and/or improvements are located on which the WORK is to be installed.

18. TIME OF THE ESSENCE: Time is of the essence of this Contract.

19. TERMINATION: Purchaser may terminate this contract for his own convenience in whole or in part, by written or telegraphic notice at any time. In such event, Purchaser shall pay Contractor all labor and material costs incurred on the WORK prior to such notice and reasonable and normal overhead and profit, less salvage value.

20. WAIVER OF BREACH: No waiver by Purchaser of a breach of any provision of this contract shall constitute a waiver of any other breach or of such provision.

21. DATE OF THE CONTRACT: The date of the Contract shown in the Agreement shall be the date of the Contract regardless of the date when the Contract is signed and delivered.

22. The headings of Articles, Sections, paragraphs and other parts of the Contract are for convenience only and do not define, limit or construe the contents thereof.

## APPENDIX B

## Westinghouse

## Large Power Transformer Equipment

Large Power Transformers, Shunt Reactors

### Price References, Discounts, Commissions and Multipliers

| Price Reference | Apparatus① | User Discount 48-001 ①② Discount | Multiplier | Agent Commission |
|---|---|---|---|---|
| ③PL 48-620 | Shell Form Power Transformers, and Oil-Immersed Shunt Reactors | Effective April 10, 1972  25% | 0.75 | None |

① Changed or added since previous issue.
② All users including private and public utilities, industrials, REA-coops, government agencies, federal, state, county and municipal governments, contractors and educational institutions.
③ This price list is for estimating purposes only.

### Standard Conditions of Sale
#### Prices
Prices, discounts and commissions are subject to change without notice.

Computing final net prices: Compute net price for each unit, drop the cents, and multiply by the number of units.

#### Price Policy
*Effective May 1, 1973*①

#### Price Policy A
Prices are firm up to twelve months from date of Purchaser's order. When shipment is required or specified in excess of twelve months from date of purchase order, prices are subject to adjustment upward or downward for changes in labor and material costs, such adjustments to be determined in accordance with the terms set forth in Westinghouse Form 30500A or any revision in effect on date of order, except, the base month shall be the thirteenth month after acceptance of the Westinghouse proposal.

#### Price Policy B①
If a firm price is required for a period longer than 12 months, it can be extended to a maximum of 5 years by making additions as follows:

⅓% per month for 13th thru & including the 60th month.

The Purchaser must, at the time the order is entered, select which of these two price policies (A or B) applies.

#### Taxes
The price does not include any Federal, state or local property, license, privilege, sales, use, excise, gross receipts or other like taxes which may now or hereafter be applicable to, measured by or imposed upon or with respect to the transaction, the property, its sale, its value or its use, or any services performed in connection therewith. Purchaser agrees to pay or reimburse any such taxes which Westinghouse or Westinghouse's subcontractors or suppliers are required to pay.

#### Standard Terms of Payment
Standard terms of payment are net within 30 days from date of invoice.

#### Accelerated or Delayed Payments①
There will be no reduction in price for payments more favorable to Westinghouse than the standard terms.

If payments are not made in conformance with the standard terms, the quoted price shall, without prejudice to the right of Westinghouse to immediate payment, be increased by an amount equal to the lesser of 8% per year on the unpaid balance or the highest legal rate.

#### Payments
If, in the judgment of Westinghouse, the financial condition of the Purchaser, at any time during the manufacturing period, or at the time the product is ready for shipment, does not justify the terms of payment specified, Westinghouse may require full or partial payment in advance.

If shipments are delayed by the Purchaser, payments shall become due from date when Westinghouse is prepared to make shipment. If manufacture is delayed by the Purchaser, payment shall be made based on the contract price and percent of completion and Purchaser shall reimburse Westinghouse for any additional costs resulting from such delay. Products held for the Purchaser shall be at the risk and expense of the Purchaser.

#### Delivery
F.O.B.–P/S–Frt./Ppd. and Allowed: This product is delivered F.O.B. point of shipment, freight prepaid to accessible common carrier point nearest to the first destination, and absorbed in the price.

#### Freight Prepaid is defined as:
Area A – Shipments to destinations within the United States:
To the common carrier point nearest to the first destination, but within the confines of the United States except Alaska and Hawaiian Islands.

Area B – Shipment to destinations other than Area A.
To the common carrier point nearest to the point of departure from Area A to Alaska, Hawaii or Panama Canal Zone, Puerto Rico, and any other territory dependency, insular possession, or trust territory of the United States.

#### Export Packing①
If the Purchaser or the carrier requires the product packed for sea shipment (export packing), the proper price addition must be made from the product price list.

#### F.O.B. – Dest. – Frt/Ppd. and Allowed:
When the Purchaser's specification calls for delivery F.O.B. destination, Westinghouse will deliver F.O.B. accessible common carrier point nearest first destination, freight prepaid and 1% will be added to the net price.

In event of shipping loss or damage:
(1) Notification must be given to the Westinghouse location from which the shipment originated within 72 hours of delivery;

(2) Written notations of apparent loss and damage must be made on the carrier's delivery receipt;

(3) Concealed damage must be immediately reported to the delivering carrier with a request for an inspection.

Cartage (Store Door) Delivery: Transportation charges incurred from the nearest common carrier point to final destination or to ship side (in case of shipments to U. S. possessions) are the responsibility of the customer unless the common carrier furnishes store door delivery at no extra charge.

Transportation charges on local shipments from warehouses will be borne by Westinghouse to the same extent as common carrier furnishes store door delivery at no extra charge.

Origin, Method of Shipment and Routing: Westinghouse will determine the point of origin of shipment, the method of transportation, and the routing of shipment. Purchasers requiring shipment by a method or routing other than that of Westinghouse selection will be billed any excess or premium in transportation charges. For example, in case the purchaser requests AIR EXPRESS

Prices, discounts and commissions are subject to change without notice.

1144

# Westinghouse

shipment. Westinghouse will absorb an amount equal to the charges of the normally selected common carrier. If the actual transportation charges on these shipments are less than such common carrier charges, Westinghouse will absorb only the actual charges. Any charges for special services (such as special trains, literage, or construction or repair of transportation facilities) will be paid or reimbursed by the Purchaser.

If Westinghouse elects to ship by other than common carrier, the full transportation charges will be prepaid.

In no case will Westinghouse absorb transportation charges in excess of the actual amount received by the carrier for its services.

Purchaser Pick-up: No allowance will be made in lieu of transportation if the Purchaser accepts shipment at factory, warehouse or freight station. Transportation charges will not be deducted from a selling price.

U. S. Government: When U. S. Government specifications require a government bill of lading, quotation will be F.O.B. point of shipment, freight not allowed.

Loss, Damage or Delay: Westinghouse shall not be liable for failure to perform or for delay in performance due to fire, flood, strike or other labor difficulty, act of any governmental authority or of the Purchaser, riot, embargo, car shortage, wrecks or delay in transportation, inability to obtain necessary labor, materials, or manufacturing facilities from usual sources or due to any other cause beyond its reasonable control.

In the event of delay in performance due to any such cause, the date of delivery or time for completion will be postponed by such length of time as may be reasonably necessary to compensate for the delay.

Standard Warranty①
Westinghouse warrants that all components of the transformer delivered by it will be of the kind and quality described in the order or contract and will be free of defects in workmanship and material. Should any failure to conform to this warranty appear within one year after date of shipment, Westinghouse shall upon prompt notification thereof and substantiation that the equipment has been stored, installed, operated and maintained in accordance with Westinghouse recommendations and standard industry practice, correct such non-conformities, at its option, either by repairing any defective part or parts or by supplying a repaired or re-

placement part or parts F.O.B. Westinghouse Repair Service plant or factory. However, if Westinghouse has installed the equipment or furnished field engineering services with respect to its installation, and provided such installation has not been delayed by the Purchaser, the warranty period shall terminate one year after the completion of installation, or 18 months after the date of shipment, whichever occurs earliest.

In addition, Westinghouse warrants for a period of ten years from the date of shipment that the core and coil assembly of the transformer will remain free of damage resulting solely from defects in such core and coil assembly. In the event that Westinghouse is promptly notified within the warranty period of a failure to comply with this warranty, Westinghouse, at its option either will repair or replace the defective and damaged core and coil assembly or will supply a repaired or replacement core and coil assembly F.O.B. Westinghouse Repair Service plant or factory. Westinghouse will not be responsible under this extended warranty for handling, storing, treating or replacement of transformer oil.

In no event shall Westinghouse be responsible for providing work access to the defect, including disassembly and reassembly of the equipment or for providing transportation to and from the Westinghouse Repair Service plant or factory.

The conditions of any field test shall be mutually agreed upon and Westinghouse shall be notified of, and may be represented at, all tests that may be made.

The foregoing warranty is exclusive and in lieu of all other warranties of quality whether written, oral, or implied (including any warranty of merchantability or fitness for purpose).

The remedies provided above shall be Purchaser's sole remedies for any failure of Westinghouse to comply with the warranty provisions, whether claims by the Purchaser are based in contract or in tort (including negligence). The warranties and remedies set forth herein are conditioned upon the proper receipt, handling, storage and installation of the equipment supplied hereunder and upon the equipment having been operated and maintained in accordance with Westinghouse recommendations and standard industry practice, and not having been subjected to accident, alteration, abuse or misuse. In addition, Westinghouse shall not be responsible for any failure to comply with

this warranty which is traceable to bushings not supplied by Westinghouse.

Export Warranty
The standard stateside warranty will apply. However, in no event will the warranty for all components of the transformer be in force beyond a maximum of 18 months after being ready for shipment at the Westinghouse factory.

Special Warranty①
When requested, the Westinghouse standard warranty liability will be extended to cover the direct cost of:

1. Removing the transformer or parts from service and loading to adjacent rail car or line-haul truck.

2. Line-haul transportation between the factory or repair facility and the accessible common carrier point nearest:
   a. The installation site within the continental U. S. or
   b. The point of entry (FOB surface carrier) or departure (to ship side) in the continental U. S.

3. Unloading from the rail car or line-haul truck adjacent to the installation site and reinstallation of the transformer or parts.

For this additional coverage add 2% to the net price for each transformer.

Purchaser, as owner of the transformer, will retain full responsibility for any damage in transit.

The total Westinghouse liability for Paragraphs 1, 2 and 3 under this special warranty will not exceed 50% of the net purchase price of the warranted apparatus.

The Westinghouse liability for paragraphs 1, 2, and 3 under this special warranty shall be limited to only the removal of the main core and coil assembly and tank of the transformer, during the period from 18 months after shipment to 10 years after shipment. During this period of time the cost of removing any external appurtenances such as load tap changer mechanism, bushings, coolers, valves, lightning arresters or fittings from the transformer and removal, handling, storage, treating or replacement of the oil is solely the responsibility of the Purchaser.

In addition the expense for the following items is not included under any circumstances:

1. Removing adjacent apparatus, structures or firewalls.

2. Extra rigging, loading, unloading and local transportation where rail car or

C153

## Large Power Transformer Equipment

Large Power Transformers, Shunt Reactors

line-haul truck cannot be placed adjacent to the installation site.

3. Installation of spare transformers, incremental costs of supplying temporary service, etc.

4. Special services, such as but not limited to special trains or trucks, premium transportation, literage, or construction or repair of transportation facilities.

### Limitation of Liability

Westinghouse shall not be liable in contract or in tort for special, indirect, incidental, or consequential damages, such as, but not limited to, loss of profits or revenue, loss of use of power system, cost of capital, cost of purchased or replacement power, or claims of customers of Purchaser for service interruptions. The remedies of the Purchaser set forth herein are exclusive, and the liability of Westinghouse with respect to any contract, or anything done in connection therewith such as the performance or breach thereof, or from the manufacture, sale, delivery, resale, installation or technical direction of installation, repair or use of any equipment covered by or furnished under this contract whether in contract, in tort, or otherwise, shall not exceed the price of the equipment or part on which such liability is based.

### Patents

Subject to the following provisions, Westinghouse shall at its own expense, defend or at its option settle any claim, suit or proceeding brought against the Purchaser, and/or its vendees, mediate and immediate, so far as based on an allegation that any goods, material, equipment, device or article (hereinafter referred to as product) or any part thereof furnished hereunder constitutes a direct or a contributory infringement of any claim of any patent of the United States. This obligation shall be effective only if Purchaser shall have made all payments then due hereunder and if Westinghouse is notified promptly in writing and given authority, information and assistance for the defense of said claim, suit or proceeding. Westinghouse shall pay all damages and costs awarded in such suit or proceedings so defended. In case the product or any part thereof furnished hereunder becomes the subject of any claim, suit or proceeding for infringement of any United States patent, or in the event of an adjudication that such product or part infringes any United States patent, or if the use or sale of such product or part is enjoined, Westinghouse shall, at its option and its own expense, either

(a) procure for the Purchaser the right to continue using said product or part thereof; or

(b) replace it with a non-infringing product; or

(c) modify it so it becomes non-infringing; or

(d) as a last resort remove it and refund the purchase price and the transportation and installation costs thereof.

The foregoing indemnity does not apply to the following:

1. Patented processes performed by the product, or another product produced thereby.

2. Products supplied according to a design other than that of Westinghouse and which is required by the Purchaser.

3. Combinations of the product with another product not furnished hereunder unless Westinghouse is a contributory infringer.

4. Any settlements of a suit or proceeding made without Westinghouse's written consent.

The foregoing states the entire liability of Westinghouse with respect of patent infringement by said product or any part thereof.

If a suit or proceeding is brought against Westinghouse solely on account of activities enumerated in paragraphs 1, 2 and 3 above, Purchaser agrees to indemnify Westinghouse in the manner and to the extent Westinghouse indemnified Purchaser in the preceding paragraph insofar as the terms thereof are appropriate.

### Title – Risk of Loss

The product sold shall remain the personal property of Westinghouse and shall remain personal property until fully paid for in cash, and the Purchaser agrees to perform all acts which may be necessary to perfect and assure retention of title to such product by Westinghouse. Risk of loss of the product, or any part of same, shall pass to the Purchaser upon delivery of such product or part, F.O.B., point of shipment.

### Termination

Any order or contract may be terminated by the Purchaser only on written notice and upon payment of reasonable and proper termination charges.

### Returning Products

Authorization and shipping instructions for the return of any product must be obtained by the Purchaser from Westinghouse sales office or distribution outlet before returning

the product. Product must be returned with complete identification in accordance with Westinghouse instructions or it will not be accepted. Where a Purchaser requests authorization to return product for reasons of his own, he will be charged for placing the returned goods in salable condition (restocking charge) and for any outgoing and incoming transportation paid by Westinghouse.

In no event will Westinghouse be responsible for product returned without proper authorization and identification.

### Held Orders

Any order held or rescheduled at the request of the Purchaser will be subject to, the prices and conditions of sale in effect at the time of the release of the hold or the reschedule.

There will be a minimum billing of $35.00 for any order held or rescheduled at the request of the Purchaser.

### Drawing Approval

Drawing approval assures the Purchaser that Westinghouse has designed the apparatus as described and detailed in the Purchaser's specification. If at drawing approval, Westinghouse has failed to design the apparatus in line with the Purchaser's specification, Westinghouse will make the appropriate changes at no charge to Purchaser. Where Purchaser's specifications are not definitive, Westinghouse reserves the right to design the apparatus in line with, in Westinghouse's judgment, good commercial practice. If at drawing approval, the Purchaser makes changes outside of the design as covered in his specification, Westinghouse will then be reimbursed reasonable charges and allowed a commensurate delay in shipping date based on the changes involved.'

① Changed or added since previous issue.